IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HEATHER MAE MOUNCE,                          Case No.  3:22-CV-00914- HZ

        Plaintiff,

                                OPINION & ORDER

    v.

PAUL CHARLES VITT; DEENA LOZIER;
MARILYN MENDOZA; JANELLE POTTS;
PAULA MYERS; TIM CAUSEY; COLETTE
PETERS; HEIDI STEWARD; MIKE GOWER;
MARK NOOTH; ROB PERSSON; KEN
JESKE; JOE BUGHER; GARRY RUSSELL;
NICHOLE BROWN; STATE OF OREGON;
and OREGON DEPARTMENT OF
CORRECTIONS,

        Defendants.


William Edward Neusteter
W. Edward Neusteter, Attorney at Law
P. O. BOX 1716
Sisters, OR 97759
      Attorneys for Plaintiff

Tracy Ickes White
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

Sara Del Rubin
Oregon Department of Justice
Trial Division
100 SW Market St
Portland, OR 97201

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

      Plaintiff Heather Mae Mounce, a former adult in custody at Coffee Creek Correctional

Facility ("CCCF"), brings this civil rights action asserting claims under 42 U.S.C. § 1983

("Section 1983") and state law. Against Defendants Myers, Causey, Peters, Steward, Gower,

Nooth, Persson, Jeske, Bugher, Marti A. Wilson as personal representative of the Estate of Garry

Russell ("Russell"), and Brown ("Individual Defendants")[1]—with some variation in specific

individuals between claims—Plaintiff claims violations of the Eighth Amendment pursuant to

Section 1983 for (1) unsafe conditions during transportation to and from Deer River Correctional

Institution ("DRCI") during an evacuation ("Transport Conditions Claim"); (2) conditions of

confinement at DRCI during the evacuation ("DRCI Conditions Claim"); (3) COVID-19

conditions during her confinement ("COVID-19 Conditions Claim"); and (4) inadequate medical

care ("Inadequate Medical Care Claim"). FAC ¶¶ 50-66. Against Defendants the State of Oregon

and Oregon Department of Corrections ("ODOC"), Plaintiff alleges negligence related to the

---

[1] Plaintiff had also asserted claims against Defendants Vitt and Potts but has since dismissed
these individuals. *See* ECF Nos. 44, 52. In addition, although Plaintiff's complaint names
Defendants Mendoza and Lozier, no claims appear to be directed at them in their individual
capacities. *See* First Amended Complaint ("FAC"), ECF 34.

same conditions. FAC ¶¶ 67-109. Finally, Plaintiff alleges two breach of contract claims against Defendant Myers. FAC ¶¶ 110-136.

## BACKGROUND

Plaintiff was a prisoner at CCCF from October 31, 2019, through June 5, 2023. Arrington Decl. ¶ 4, ECF 68. The events underlying this action are as follows.

## I.    Wildfire Evacuation

On September 10, 2020, CCCF underwent an emergency evacuation due to nearby wildfires. State Defendants' Answer ("Answer") to FAC ¶ 12, ECF 38. Plaintiff was evacuated along with the other CCCF prisoners to DRCI. Neusteter Decl. Ex. 7 ("Mounce Dep.") 57:11-13, ECF 72. ODOC had never evacuated "for that length of distance" and "had no expectation of how long it was going to take." *Id*. Ex. 9 18:3-13. During transport, Plaintiff complains that prisoners on board the transport vehicle lacked access to restrooms, were not provided with food or water, and COVID-19 preventive measures such as facemasks, social distancing, and screening prisoners/staff for symptoms were not observed. FAC ¶ 14. Plaintiff was seated next to an individual whose urine "touched" her during transport. Mounce Dep. 120:5-13. An ODOC representative agreed that "things…could have been done better or differently had we had different resources." Neusteter Decl. Ex. 9 18:14-22.

When she arrived at DRCI, she received food, but was not provided food again until evening the next day. Mounce Dep. 123:22-124:1. Plaintiff was provided with access to showers, but they lacked curtains. *Id*. 123:1-15.

Plaintiff was at DRCI until September 15, 2020. Neusteter Decl. Ex. 18. During transport back to CCCF, Plaintiff's head struck a "cage" in front of her as the driver of the vehicle was

driving "really fast" around some curves. Mounce Dep. 58:6-12. Plaintiff was bleeding from the top of her head. *Id*. 61:14-23.

An undated and unsigned "feedback form" entitled "DOC Wildfire Evacuation" identified challenges with the evacuation, including staffing, maintaining separation between female and male prisoners, maintaining COVID-19 protocols, smoke mitigation, ability of prisoners to communicate with family and friends, feeding, medical, and "staging on buses at CCCF and once arrived and DRCI, restrooms for that long of a trip." Neusteter Decl. Ex. 5. The form noted "DRCI staff along with the minimal number of CCCF staff that arrived were challenged with supervision over 2000 prisoners of mixed gender and classifications. Even with these additional staff it was not enough to operate 1 shift of a population of this size spread over two institutions under normal operations let alone multiple shifts under emergency conditions." *Id*.

Following transport back to CCCF, Plaintiff was put immediately back into her cell without the opportunity to speak with anyone about obtaining medication for her injury. Mounce Dep. 63:25-64:18. Plaintiff observed several items missing from her cell, including a couple of books and socks. *Id*. 141:5-13. That evening, Plaintiff sent a request to have her injury examined and treated. *Id*. 66:14-20. In the following days, Plaintiff was "throwing up so much [her] cell mate kept contacting security and security was contacting medical and telling them she needs to be seen." *Id*. 67:13-18. The wound stopped bleeding after about 24 hours. *Id*. 71:17-19. She also began to experience "intense neck pain" and migraines similar to migraines she had experienced before. *Id*. 75:12-23.

A week after Plaintiff sustained her injury, she was seen by a certified nurse assistant ("CNA"). *Id*. 66:21-67:11. The CNA took Plaintiff's blood pressure and attempted to check her

eyes with a pen, but her pen was not working. *Id*. 67:19-21. The CNA asked about, but did not inspect, Plaintiff's head wound. *Id*. 67:22-23. Plaintiff told the CNA that she believed it was okay and was not bleeding anymore. *Id*. 68:4-9. When Plaintiff asked if the CNA would like to inspect the wound, the CNA stated that a provider would follow up to see her. *Id*. 68:8-11.

Plaintiff saw nurse Defendant Mendoza about a month later. *Id*. 68:12-15. Plaintiff testified that the focus of Defendant Mendoza's evaluation was her headaches, not her head injury. White Decl. Ex. 1 90:6-91:21, ECF 66. When Defendant Mendoza would not treat Plaintiff's head injury, Plaintiff "got upset and walked out." *Id*. 91:13-21. Plaintiff refused to see Defendant Mendoza again. *Id*. 154:5-12. On November 30, 2020, Defendant Mendoza responded to a grievance filed by Plaintiff related to her head injury treatment. Neusteter Decl. Ex. 29. Defendant Mendoza's response recounted the events underlying her complaint and "encourag[ed]" Plaintiff to continue to follow the plan of care that she had directed relating to her neck pain. *Id*. As to the concussion, Defendant Mendoza's response noted that she had instructed Plaintiff to return to the clinic for her concussion if vomiting symptoms continued but that Plaintiff said she would call her lawyer instead. *Id*.

Plaintiff was treated by Defendant Lozier in December 2020 for a concussion, placing Plaintiff on a "medical lay in." Mounce Dep. 150:2-151:6.

Plaintiff's head injury exacerbated existing neck pain. Neusteter Decl. Ex. 25 ¶ 8, ECF 72-25. Plaintiff "regularly purchased muscle rub" to treat her neck pain, and lost financial compensation based on a medical work restriction. *Id*. ¶¶ 8-9. Plaintiff suffered headaches, numbness, and pain related to her head/neck injury. *Id*. ¶ 11. Chart notes indicate multiple visits with medical providers related to her neck pain, *id*. Ex. 14, but treatment was not effective in relieving her symptoms. *Id*. Ex. 25 ¶ 11.

II.    **COVID-19 Conditions at CCCF**

Shortly after Plaintiff's confinement began at CCCF, Oregon Governor Kate Brown

declared a state of emergency due to the COVID-19 pandemic on March 8, 2020. *Id*. Ex. 2.

Although ODOC was enacting protocols to prevent the spread of COVID-19 throughout its

institutions, prisoners reported lack of compliance with policies and/or inadequate policies were

endangering prisoners. *Id*. Exs. 4, 6, 11, 22, 24, 27. One such CCCF prisoner testified in another

case that prison practices resulted in healthy and COVID-19 positive prisoners "mixing." *Id*. Ex.

11 ¶ 13. Staff members moved between facilities even when outbreaks were occurring. *Id*. ¶¶ 15-

16. Prisoners from multiple units attended "Chow Hall, Medline, and work assignments

together." *Id*. ¶ 14. Some staff did not wear N-95 masks, but instead "neck gaiters" or "fashion

masks" and observed a "lack of effort for social distancing" when it was possible to do so. *Id*. ¶¶

19, 22, 23, 25. Prisoners avoided testing to avoid disciplinary segregation units. *Id*. ¶ 21.

Defendant Russell acknowledged on May 22, 2020, that multiple prisoners at CCCF reported

concerns about "(1) face mask usage by prisoners, specifically at the Commissary Distribution

Center; (2) inadequate social distancing throughout the dormitories; (3) PPE usage with health

services staff; (4) moving medically vulnerable prisoners into dormitory living; and (5) cell

sanitation and hygiene." *Id*. Ex. 27 ¶ 34.

Plaintiff filed a state habeas corpus case on October 23, 2020 related to COVID-19. *Id*.

Ex. 25 ¶ 11.

Plaintiff tested positive for the presence of antibodies against SARS-COV-2 on June 15,

2023 which "likely indicates current or past infection" by COVID-19. *Id*. Ex. 15. Based on this

test, an interview with Plaintiff, and contemporaneous ODOC records about COVID-19 testing

at CCCF, Plaintiff's medical expert opines that Plaintiff "likely…experienced the COVID-19

disease in early January 2021." *Id.* Ex. 16 ¶¶ 3, 5, 7. At the time of her alleged infection, Plaintiff

declined to be tested because she reported that the nurses performing the testing were not

changing gloves in between swabbing patients' nostrils. *Id.* ¶ 3.

## III.    Rectal Condition

On November 25, 2020, Plaintiff reported that she had been experiencing rectal bleeding

for two to three months, and received a rectal examination. Neusteter Decl. Ex. 14 at 3. ODOC

medical personnel charted "schedule for colonoscopy" on April 22, 2021, but that procedure was

delayed because of COVID-19-related scheduling problems. *Id.* Ex. 30 at 2. Plaintiff received a

colonoscopy on April 29, 2022, and a polyp was removed and biopsied. *Id.* Ex. 14 at 15-18.

While experiencing rectal bleeding, Plaintiff used her own funds to treat her symptoms

with Pepto Bismol and Preparation H. *Id.* Ex. 25 ¶ 5. Due to her symptoms and related medical

appointments, Plaintiff missed several opportunities to report to her work assignment and receive

financial compensation. *Id.* ¶¶ 6-7. Plaintiff never filed a grievance related to her rectal bleeding

treatment because she was "unaware that [her] rectal bleeding was being treated in a manner that

[she] should file a grievance for." *Id.* ¶ 11. On March 17, 2021, Plaintiff amended her state

habeas corpus case relating to COVID-19 to include her rectal bleeding and head/neck injury. *Id.*

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of " 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### I. Section 1983 Claims

Defendants move for summary judgment against Plaintiff's Section 1983 claims (First through Fourth Claims for Relief) on several bases, addressed below.

#### A. Individual Liability

Defendants first argue that a number of the Individual Defendants are entitled to summary judgment because there is no evidence any of them were personally involved in the alleged constitutional violations.

A person deprives another of a constitutional right "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the [constitutional] deprivation.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). Although there is no vicarious liability under Section 1983, supervisory officials may be liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation and citation omitted) "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Id.* (quoting *Johnson*, 588 F.2d at 743). Causation also may be established when an official "'knowingly refuse[s] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Starr*, 652 F.3d at 1207–08 (quoting *Dubner v. City and Cnty. of S.F.*, 266 F.3d 959, 968 (9th Cir. 2001)). In addition, "[S]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of a constitutional violation.' *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013)."

Plaintiff's opposition to Defendants' motion identifies the following evidence as creating a genuine issue of fact as to each of the following Individual Defendant's liability:

Tim Causey was the Superintendent of DRCI and "supervise[d] all aspects" of that facility. Neusteter Decl. Ex. 4 ¶ 1. Defendant Causey was also the "Commander" of the wildfire

evacuations. *Id.* Ex. 5. In support of her claims against Defendant Causey, Plaintiff also relies on the contents of the undated and unsigned "feedback form"—summarized in greater detail above—identifying issues with the evacuation and conditions at DRCI. *Id.* Ex. 5.

Nichole Brown is the Superintendent of CCCF. Answer ¶ 26. Plaintiff testified that either Defendant Brown or Defendant Myers responded to "one of [her] grievances" and that she believes Defendant Brown "was part of COVID decisions." Mounce Dep. 148:1-8. Plaintiff also relies on declaration testimony of another prisoner at CCCF about COVID-19 conditions at CCCF while Defendant Brown was Superintendent. Neusteter Decl. Ex. 11. Finally, related to the evacuation, Plaintiff cites deposition testimony about the conditions during the evacuations. *Id.* Exs. 7-10.

Joe Bugher (Health Services Administrator) and Garry Russell (ODOC Chief of Security) led the Acting Operations Center ("AOC") for the COVID-19 pandemic. *Id.* Ex. 12 ¶ 2; Ex. 24 ¶ 11. The AOC also "made the ultimate decision to evacuate the prisons" during the wildfires. Neusteter Decl. Ex. 17. Defendant Bugher was "responsible for managing health services for all adults in the custody of ODOC and for ODOC's response to the COVID-19 pandemic." Neusteter Decl. Ex. 12 ¶ 2. Defendant Bugher was responsible for legally mandated medical care for ODOC prisoners. *Id.*

Michael Gower was the former Assistant Director of Operations for ODOC. Answer ¶ 18. Defendant Gower was included in emails following the wildfire evacuation that discuss pay for employees during those events. *Id.* Ex. 21.

Ken Jeske was the Administrator for the Oregon Correctional Enterprises OCE, which has operations at CCCF. Answer ¶ 21. Oregon Correctional Enterprises "has primary

responsibility for ensuring the safety of prisoners in its worksites" and adopted a "comprehensive COVID-19 prevention strategy to protect prisoners." Neusteter Decl. Ex. 22 ¶ 7.

Mark Nooth was the "Eastside Institutions Administrator for ODOC" to whom the DRCI superintendent reports. Answer ¶ 19.

Rob Persson was the "Westside Institutions Administrator for ODOC" to whom the CCCF superintendent reports. Answer ¶ 20. A log sheet shows that Mr. Persson worked with another individual "for transportation of 100 youth for OYA to CCCF" and "advised 1st student can provide the buses we need." Neusteter Decl. Ex. 23. Defendant Persson was also forwarded an email relating to questions from the New York Times about the evacuations. *Id*. Ex. 17.

Colette Peters was the Director of ODOC and Heidi Steward was the Deputy Director of ODOC. Answer ¶¶ 16-17. Defendants Peters and Steward—among others—made the decision to evacuate because of the wildfires. Neusteter Decl. Ex. 13. Following the evacuations, Defendant Peters acknowledged that ODOC "became aware of things that could have been done better or differently," and that "there were several problems encountered during the evacuation to Deer Ridge." *Id*. Ex. 9 at 18:14-22; 13. She also acknowledges that she was "disheartened to hear about some of the conditions at DRCI" and noted that they were being looked into and addressed. *Id*. Ex. 13. Regarding COVID-19 conditions, both Defendants Peters and Steward received briefing from the AOC. *Id*. Ex. 24 ¶ 12. Defendant Steward oversaw "virtually all aspects of ODOC, including Health Services and Institutions" and was a policy advisor to the AOC. *Id*. ¶¶ 5, 11. Plaintiff also relies on declaration testimony of another prisoner at CCCF about COVID-19 Conditions at CCCF. *Id*. Ex. 11. This declaration was filed in a case in which Defendants Peters and Steward are also named as defendants. *Id*.

The Court addresses the supervisory liability of the Individual Defendants for each claim in turn.

              i.        Transport Conditions Claim (First Claim for Relief)

Plaintiff asserts her Transport Conditions Claim against Defendants Myers, Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, and Russell. All Individual Defendants except for Defendant Myers seek summary judgment in their favor.

The evidence that Plaintiff identifies in support of individual liability generally falls into four categories: (1) evidence of general supervisory authority or responsibility for prisoner welfare; (2) evidence that certain Individual Defendants had a role in ordering the evacuation; (3) evidence of the conditions during transport; and (4) evidence that various Individual Defendants acknowledged problems with the transport after it had occurred.

First, Plaintiff's evidence of Individual Defendants' positions at the prison and general statements about their responsibilities cannot establish supervisory liability under Section 1983 without some evidence of the individuals' personal involvement in the constitutional deprivation or a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr*, 652 F.3d at 1207. In *Starr*, the Ninth Circuit held that allegations of the supervisor's "knowledge of the unconstitutional conditions in the jail, including his knowledge of the culpable actions of his subordinates, coupled with his inaction, amounted to acquiescence in the unconstitutional conduct of his subordinates." *Id.* at 1208. Thus, the evidence here regarding supervisors' roles in the prisons or with respect to prisoner welfare can only give rise to their liability if Plaintiff provides evidence of their culpable action or inaction with respect to the conditions during the evacuation transportation. *See id.* at 1207 ("when a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her

own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates").

None of the remaining categories of evidence raise a genuine issue of material fact about the Individual Defendants' culpable action or inaction with respect to the conditions of the wildfire evacuation, either through personal involvement or a causal connection. Evidence that certain Individual Defendants decided to evacuate is different from evidence that the individuals participated in decisions about the conditions of that evacuation. Ordering evacuation—or participating in that decision—may suggest that some of the Individual Defendants had supervisory authority over those implementing that evacuation, but that evidence would only indicate vicarious liability insufficient to establish Section 1983 liability. Nothing in the record suggests that any of the Individual Defendants were personally involved in decisions about implementation of the evacuation. Although there is some evidence that there was some communication with Defendant Persson regarding "transportation of 100 youth for OYA to CCCF," that evidence does not appear to relate to the transportation of prisoners from CCCF to DRCI.

Plaintiff's general evidence of conditions during transportation is also insufficient. Plaintiff identifies no evidence that any of the Individual Defendants knew about these conditions or that the conditions resulted from "a policy so deficient that the policy itself is a repudiation of constitutional rights." *See Crowley*, 734 F.3d at 977 (internal quotations and citation omitted). In other words, evidence of the conditions during transportation does not establish any causal connection between any action of the Individual Defendants and those conditions.

Finally, evidence that some Individual Defendants acknowledged *after* the evacuation that there were issues with the evacuation does not give rise to a genuine issue of material fact on the Individual Defendants' liability. There can be no culpable action or inaction of a supervisor where that supervisor did not know of constitutional violations. *See*, *e.g. Salas v. Nichols*, No. 17-CV-00663-JST, 2017 WL 2834061, at *9 (N.D. Cal. June 30, 2017) (no Section 1983 supervisory liability for defendants who merely reviewed grievances after the violation because such evidence only established that the defendants were "on notice regarding alleged past constitutional violations, and not on notice regarding ongoing constitutional violations").

In sum, there is no evidence that any of the Individual Defendants were aware of the allegedly unconstitutional conditions of the transportation such that their action or inaction with respect to that knowledge amounts to deliberate indifference. Nor is there any evidence that the conditions of transportation during the wildfire evacuations were pursuant to some patently unconstitutional policy. Without such evidence, Plaintiff fails to raise a genuine issue of material fact on the Individual Defendants' liability for her Transport Conditions Claim.

Accordingly, Defendants Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, and Russell are entitled to summary judgment in their favor on Plaintiff's First Claim for Relief.

   ii.  DRCI Conditions Claim (Second Claim for Relief)

Plaintiff asserts her DRCI Conditions Claim against Defendants Myers, Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, Russell, and Brown. All Individual Defendants except for Defendant Myers seek summary judgment in their favor.

Plaintiff's evidence in opposition to Defendants' motion falls into the same categories as for her Transport Conditions Claim and fail to create a genuine issue of material fact as to

Defendants' liability for the same reason. Accordingly, Defendants Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, Russell, and Brown are entitled to summary judgment in their favor on Plaintiff's Second Claim for Relief.

       iii.     COVID-19 Conditions Claim (Third Claim for Relief)

Plaintiff asserts her COVID-19 Conditions Claim against Defendants Myers, Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, Russell, and Brown. All individual Defendants except for Defendant Myers seek summary judgment in their favor.

As summarized above, Plaintiff has presented evidence that each Individual Defendant had some supervisory authority relating specifically to COVID-19 or prisoner welfare more generally. Unlike with the Transport Conditions Claim and DRCI Conditions claim, however, Plaintiff presents some evidence of a causal connection between some of the Individual Defendants and the alleged constitutional violations.

A number of other courts have addressed the question of supervisory liability for COVID-19 conditions at prisons. For example, it is not enough to show that prisoners were at risk of contracting COVID-19 and the prison supervisor was aware of that risk. *Id.* An individual defendant is not liable under Section 1983 "based solely on their role in supervising prisons." *McKissick v. Gastelo*, No. 221CV01945VAPMAA, 2021 WL 1388346, at *3 (C.D. Cal. Apr. 13, 2021) (citation omitted). There is no liability without evidence that a prison supervisor "ignored or approved… alleged lapses in enforcement of [COVID-19] guidelines. *Johnson v. Kariko*, No. 320CV05514BHSJRC, 2022 WL 4073087, at *6 (W.D. Wash. June 10, 2022), *report and recommendation adopted,* No. C20-5514 BHS, 2022 WL 4017671 (W.D. Wash. Sept. 2, 2022). There must be facts giving rise to a genuine issue of fact as to whether the supervisor was "w[as]

or should have been aware of the conditions of which Plaintiff complains." *Robinson v. Balanetre*, No. 21-CV-02071 (PMH), 2022 WL 1173365, at *6 (S.D.N.Y. Apr. 20, 2022).

Here, Plaintiff has presented evidence that Defendants Peters, Steward, Gower, Nooth, Persson, Jeske, and Bugher were named in another lawsuit, *Maney, et al. v. Brown et al.*, 6:20-CV-00570-SB, alleging inadequate COVID-19 conditions across ODOC prisons, including CCCF. Neusteter Decl. Exs. 11, 22, 24, 27. The lawsuit was filed in April 2020, well before Plaintiff's alleged COVID-19 infection in January 2021. *See* Complaint, *Maney, et al. v. Brown et al*, No. 6:20-CV-00570-SB (D. Or. Apr. 6, 2020), ECF No. 1.[2] The plaintiffs in *Maney*, one of whom was a prisoner at CCCF, alleged that the conditions across ODOC prisons were inadequate to prevent the spread of COVID-19. *Id*. The complaint also contained allegations specific to CCCF, including alleged failure to prevent, test, and treat COVID-19, and inadequate social distancing. *Id*. ¶¶ 112-116. Although not a defendant in *Maney*, Defendant Russell provided a declaration in that case noting that he was familiar with the allegations raised by the plaintiffs there. Neusteter Decl. Ex. 27 ¶ 32. In other words, there is evidence that these Defendants knew about the allegedly unconstitutional conditions about which Plaintiff complains. Plaintiff has therefore established a genuine issue of material fact as to the supervisory liability of Defendants Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, and Russell.

As to Defendants Brown and Causey, neither of them are parties to the *Maney* lawsuit, and there is no evidence in the record from which knowledge of the conditions at CCCF could be

---

[2] The Court takes judicial notice of the complaint in this case. *See Coultas v. Payne*, No. 3:11-cv-45-AC, 2015 WL 5920645, at *3 (D. Or. Oct. 9, 2015) ("The court may 'take judicial notice of undisputed matters of public record ... including documents on file in federal or state courts.' ") (quoting *Harris v. County of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012)).

imputed to them. While the record contains evidence these two Defendants were named in other COVID-19-related lawsuits, those lawsuits appear to pertain to conditions at Columbia River Correctional Institution and DRCI, not CCCF. *See* Neusteter Decl. Exs. 4, 6. There are no facts in the record from which a jury could conclude that Plaintiff contracted COVID-19 during her brief time at DRCI.

Accordingly, only Defendants Brown and Causey are entitled to summary judgment in their favor against Plaintiff's COVID-19 Conditions.

iv.    Inadequate Medical Care (Fourth Claim for Relief)

Plaintiff asserts her Inadequate Medical Care Claim against Defendants Myers, Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, Potts, Russell, and Brown. Plaintiff concedes that Defendants Jeske and Russell are entitled to summary judgment in their favor on this claim.

As for the remaining Individual Defendants, Plaintiff presents no evidence raising a genuine issue of fact as to their individual liability for this claim. Plaintiff identifies general evidence of these individuals' responsibility for prisoner welfare, but the Ninth Circuit is clear that prison administrators cannot be vicariously liable for Section 1983 inadequate medical care claims. *Peralta v. Dillard*, 744 F.3d 1076, 1085-86 (9th Cir. 2014). There is no evidence that any Individual Defendant "knowingly fail[ed] to respond to an inmate's requests for help." *Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006). Nor is there any evidence of that any of these Defendants implemented any policies so deficient that the policy was itself "a repudiation of constitutional rights" and was "the moving force of a constitutional violation." *Crowley*, 734 F.3d at 977.

Accordingly, Defendants Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, Potts, Russell, and Brown are entitled to summary judgment in their favor on Plaintiff's Inadequate Medical Care Claim.

**B.    Physical Injury**

Defendants also argue that they are entitled to summary judgment on Plaintiff's Transport Conditions Claim (except as it relates to Plaintiff's head injury[3]) and DRCI Conditions Claim based on a lack of physical injury.[4]

Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury..." 42 U.S.C § 1997e(e). Such physical injury "need not be significant but must be more than *de minimis." Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002).

Here, Plaintiff specifically alleges that she suffered physical harm and seeks economic and non-economic damages for resulting "severe physical and mental pain and suffering." *See* FAC ¶¶ 53, 57, 61, 66. These are damages to which the PLRA physical injury requirement applies, and Plaintiff does not argue otherwise. Thus, the question before the Court is whether Plaintiff has presented evidence to support physical injury sufficient to overcome the bar imposed by 42 U.S.C § 1997e(e).

---

[3] The parties both appear to repeatedly use the phrase "head injury" throughout the briefing to address both the alleged concussion/head wound as well as the exacerbated neck condition. For purposes of resolving this motion, the Court does the same.

[4] Although Defendants initially moved for summary judgment on this issue for the COVID-19 Conditions Claim as well, they have since conceded as to that claim. Def. Reply 3.

i.    Transport Conditions Claim

Plaintiff's Transport Conditions Claim seeks damages resulting from the following allegedly unconstitutional conditions: Plaintiff's head injury during transportation, lack of adequate protection from COVID-19, and lack of access to food, water, lavatories, hygiene products, clean clothing, and medications. FAC ¶ 51. Defendants concede that Plaintiff has presented evidence of physical injury to Plaintiff's head during transport, but argue they are entitled to summary judgment with respect to all portions of the claim which do not relate to Plaintiff's head injury because those portions of the claim are barred for failure to show physical injury. Plaintiff argues that lack of access to food and water constitutes physical injury.

In support of Plaintiff's claim, she cites several cases finding that denying access to food amounts to physical injury sufficient to satisfy the PLRA. *See* Pl. Resp. 23-24, ECF 71. However, as Defendants point out, each of these cases involve some physical injury as a result of the plaintiff's lack of access to food and water. *See* Def. Reply 3-4, ECF 75. For example, in *Ward v. ARAMARK Corr. Food Serv.*, the plaintiff alleged that "inadequacies in the quality, quantity, and preparation of food" caused him to have difficulty with his intestines, irritable bowel syndrome, and weight loss. No. 3:09CV-P802-S, 2011 WL 1542108, at *3 (W.D. Ky. Apr. 22, 2011). Ruling on a motion to dismiss, the court found that plaintiff's allegations were sufficient to establish a physical injury for purposes of the PLRA. *Id.* at *4.

None of the other cases cited by Plaintiff support her argument that the lack of provision of food for less than a day is a non-*de minimis* physical injury sufficient to satisfy the PLRA. Most of the other cases, like *Ward,* involved some physical injury *as a result of* inadequate food. *See, e.g., Shirley v. Sternal*, No. 09-10045-CIV, 2010 WL 6020684, at *10 (S.D. Fla. Aug. 30, 2010) (physical injury for purposes of the PLRA established where plaintiff alleged "weight loss

of forty pounds in six months, swelling, headache, light-headedness, swollen legs, constipation, upset stomach, nausea, and depression"), *report and recommendation adopted,* No. 09-10045-CIV, 2011 WL 855273 (S.D. Fla. Mar. 9, 2011); *Shepard v. Alvarez,* No. 08-10090-CIV-KING, 2009 WL 1872016, at *8 (S.D. Fla. May 21, 2009) (Weight loss of 40-50 pounds constituted physical injury under the PLRA); *Williams v. Humphreys,* No. CIV A CV504-053, 2005 WL 4905109, at *7 (S.D. Ga. Sept. 13, 2005) (allegations of "nausea, abdominal pain, and weight loss" as a result of inadequate diet sufficient to plead physical injury under the PLRA). The remaining case cited by Plaintiff did not address the question of "physical injury" under the PLRA because plaintiff sought damages not barred by the PLRA's physical injury requirement. *See Patch v. Arpaio,* No. CV08-0388-PHX-GMSDKD, 2010 WL 432354, at *10 (D. Ariz. Feb. 2, 2010).

Without some physical injury suffered as a result of the lack of access to food and water during transportation—like those at issue in the cases Plaintiff cites—Plaintiff cannot satisfy the "physical injury" requirement needed to claim "pain and suffering" damages resulting from her lack of access to food and water.

As for the remainder of the conditions Plaintiff alleges related to her Transport Conditions Claim (*i.e.*, lack of COVID-19 protections, restrooms, clothing, hygiene products, or medication during transport), she provides no evidence or argument at all that she suffered physical injury as a result of those conditions.

Defendants[5] are therefore entitled to summary judgment in their favor on Plaintiff's Transport Conditions claim (First Claim for Relief) except as it relates to Plaintiff's head injury.

---

[5] As addressed in Section I.A.i. above, the Court has already found that Defendants Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, and Russell are entitled to summary judgment on this claim based on the absence of a genuine issue of fact as to their individual

ii.    DRCI Conditions Claim

Plaintiff's DRCI Conditions Claim seeks "pain and suffering" damages for the following allegedly unconstitutional conditions: lack of adequate COVID-19 protections and lack of access to restrooms, adequate food, clean clothing, hygiene products, medications, bedding/towels, and privacy for showers. FAC ¶ 55. Defendants argue that Plaintiff has presented no evidence of physical injury sufficient to seek damages under the PLRA. Plaintiff argues that the following establish physical injury for purposes of this claim: (1) lack of access to adequate food; (2) failure to treat her head injury; (3) destruction/confiscation of personal items from her CCCF cell while she was housed at DRCI; (4) exposure to smoke. Pl. Resp. 24-26.

Plaintiff's first argument—that lack of access to adequate food is a physical injury by itself—fails for the same reason as for her Transport Conditions Claim: there is no evidence in the record that Plaintiff suffered any physical injury as a result of her short-term lack of access to adequate food, and Plaintiff's cited cases do not hold otherwise.

Plaintiff's argument related to the failure to treat her head injury cannot establish a physical injury for purposes of this claim because it is not alleged as part of her DRCI Conditions Claim. Indeed, the injury allegedly occurred on her way back from DRCI (*i.e.,* during transport).

Plaintiff's reliance on evidence that certain personal items were destroyed or confiscated likewise fails to establish physical injury. First, Plaintiff's DRCI Conditions Claim does not seek compensation for this loss. *See* FAC ¶¶ 54-57. Rather, as explained above, the allegations giving rise to the claim pertain to the conditions at DRCI, not what allegedly occurred at CCCF while

---

liability. However, this analysis is relevant to the remaining claim against Defendant Myers, and as an alternative reason that Defendants Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, and Russell are entitled to summary judgment on this claim.

Plaintiff was housed at DRCI. Second, Plaintiff's argument appears to mistake the "physical injury" requirement in the PLRA for an "economic injury" requirement. The plain language of the PLRA requires "physical" injury, and the Court is unaware of any authority for the proposition that loss of personal property can constitute a physical injury for purposes of the PLRA. Rather, several other courts have concluded that it does not. *See, e.g.*, *Stauffer v. Gearhart*, 741 F.3d 574, 583 (5th Cir. 2014) (prisoner's allegation of lost, confiscated, or damaged personal property is not "physical injury"); *Bridgewater v. Taylor*, 698 F. Supp. 2d 351, 361 (S.D.N.Y. 2010) (damages related to deprivation of property barred by PLRA absent physical injury); *Gilmore v. Wetzel*, No. 20-CV-3600, 2021 WL 51440, at *3 (E.D. Pa. Jan. 5, 2021) (damages for destruction of property without physical injury is barred by PLRA).

Finally, Plaintiff's reliance on smoke inhalation as a basis to establish physical injury is insufficient. Plaintiff's DRCI Conditions Claim does not seek damages for smoke inhalation; that is not among the conditions Plaintiff claims constituted deliberate indifference. *See* FAC ¶ 55. Moreover, Plaintiff has not provided any evidence to support that she suffered any physical injury resulting from smoke inhalation, as was present in the smoke-inhalation cases she cites. *See Caldwell v. D.C.*, 201 F. Supp. 2d 27, 33 (D.D.C. 2001) (evidence of a diagnosis of bronchial irritation from smoke inhalation was sufficient physical injury); *Enigwe v. Zenk*, No. 03-CV-854 (CBA), 2006 WL 2654985, at *6 (E.D.N.Y. Sept. 15, 2006) (evidence of high blood pressure, poor diet, and fainting spells from inhaling tobacco smoke sufficient to establish physical injury).

Because there is no evidence that Plaintiff suffered a physical injury arising from the allegedly unconstitutional conditions at DRCI, her claim for damages is barred by the 42 U.S.C.

§ 1997e(e) and Defendants[6] are therefore entitled to summary judgment on Plaintiff's Second Claim for Relief.

### C.    Failure to Exhaust Administrative Remedies

Defendants argue that to the extent that Plaintiff's Transport Conditions Claim and Inadequate Medical Treatment Claim relate to her head injury and rectal condition, the claims are barred under the PLRA for failure to exhaust administrative remedies. Plaintiff argues that she is either exempt from or has exhausted all administrative remedies.

Exhaustion under the PLRA is mandatory. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002) (citing *Booth v. Churner*, 532 U.S. 731, 741 (2001)). Under the PLRA, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory, however, only as long as "administrative remedies ... are available." *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016). "To be available, a remedy must be available as a practical matter; it must be capable of use; at hand." *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc) (internal quotation marks omitted).

Exhaustion is an affirmative defense "that must be pled and proved by a defendant." *Id.* at 1168. The defendant has the burden to prove that "there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172.

---

[6] As addressed in Section I.A.ii. above, the Court has already found that Defendants Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, Russell, and Brown are entitled to summary judgment on this claim based on the absence of a genuine issue of fact as to their individual liability. However, this analysis is relevant to the remaining claim against Defendant Myers, and as an alternative reason that Defendants Causey, Peters, Steward, Gower, Nooth, Persson, Jeske, Bugher, Russell, and Brown are entitled to summary judgment on this claim.

Once a defendant has made such a showing, the burden shifts to the plaintiff to "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* Although the burden of proof remains with the defendant, the defendant is entitled to summary judgment if undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust. *Id.* at 1166, 1172.

The administrative process applicable to plaintiff here requires prisoners to file a grievance relating to "any incident or issue regarding institutional life that directly and personally affects [them]," including "inadequate medical or mental health treatment." Or. Admin R. 291-109-0210(3). Grievance responses are sent to the prisoner within 35 calendar days from the date the grievance is accepted. Or. Admin. R. 291-109-0205(2). Once ODOC has responded, a prisoner "may appeal the initial grievance response using the grievance appeal form." Or. Admin. R. 291-109-0230(1). Initial appeals must be received by the institution grievance coordinator or designee within 14 calendar days from the date the initial grievance response was sent to the prisoner unless the prisoner can satisfactorily demonstrate why the initial appeal could not be timely filed. Or. Admin. R. 291-109-0205(3). The rules also provide for a second level of "final" appeal. Or. Admin. R. 291-109-0235

Here, with respect to Plaintiff's head injury, Plaintiff concedes that she filed an initial grievance, but not an appeal. Pl. Resp. 29. However, she argues that because there was no indication in the initial grievance response that it was "denied," no appeal was required to exhaust her administrative remedies. In the alternative, Plaintiff argues that under *Maddox v. Love,* 655 F.3d 709 (7th Cir. 2011), she exhausted her administrative remedies.

The Court finds that Defendants have satisfied their burden to show that Plaintiff failed to exhaust available administrative remedies, and Plaintiff has failed to come forward with evidence showing that such remedies were unavailable to her. The record shows that Plaintiff's grievance related to her head injury was "accepted" and responded to. Arrington Decl. ¶ 6; Neusteter Decl. Ex. 29. As noted above, when a grievance is accepted and responded to, an appeal is due within 14 days. Or. Admin. R. 291-109-0230(4). The rules do not contain a requirement that a grievance must be "denied" in order to be appealed. In fact, "denied" grievances may not be appealed. Or. Admin. R. 291-109-0230. While the rules do not define "denial," the only reference to "denial" in the rules is in the circumstance of an untimely grievance, which the rules state will be denied. Or. Admin. R. 291-109-0205(1). There is no indication that Plaintiff's grievance was rejected on procedural grounds. Indeed, the record shows that it was accepted and responded to. Because Plaintiff's grievance was accepted and responded to, and was not timely appealed, she failed to exhaust administrative remedies.

Plaintiff's citation to *Maddox* does not support a contrary conclusion. That case involved a prisoner who followed an applicable three-step grievance process to which the prison responded on the merits. 655 F.3d at 721. After the prisoner filed suit, the defendant argued that the prisoner had failed to exhaust administrative remedies because his grievance was procedurally deficient. *Id.* The court disagreed, finding that "[w]here prison officials address an inmate's grievance on the merits without rejecting it on procedural grounds, the grievance has served its function of alerting the state and inviting corrective action, and defendants cannot rely on the failure to exhaust defense." *Id.* at 722. That is not what happened here. Unlike the prisoner in *Maddox*, Plaintiff here has not followed the full grievance process. Without that process, the

function of the PLRA to provide Defendant a full opportunity to address the complaint before Plaintiff filed suit was not served as it was in *Maddox*.

As to Plaintiff's rectal condition, Plaintiff admits that she never filed a grievance related to inadequate treatment of that condition. Pl. Resp. at 29. However, she argues that she was unaware that the treatment of that condition was inadequate until March 17, 2021, when her court-appointed attorney in a state habeas corpus case on the COVID-19 conditions amended the habeas pleading to include the untreated rectal bleeding. Neusteter Decl. Ex. 25 ¶ 11. At that point, she argues that she was prohibited from filing a grievance due to pending litigation related to inadequate medical care of her rectal condition. Pl. Resp. 29, citing Or. Admin. R. 291-109-0210(4) (a prisoner "cannot grieve… Claims or issues the prisoner has pursued or is pursuing in pending litigation in state or federal courts").

Plaintiff cites no case law in support of her argument that she should be excepted from exhaustion requirements because she did not know her care was inadequate. Moreover, Plaintiff was not asymptomatic; she notes that she was attempting to treat her symptoms on her own using Pepto Bismol and Preparation H and that she missed work because of bleeding and lack of energy. Neusteter Decl. Ex. 25 ¶¶ 5-6. Plaintiff has failed to carry her burden to show that administrative remedies were unavailable to her in the time that passed between the beginning of her rectal bleeding "two-to-three months" before November 25, 2020 and when her state habeas corpus pleading was amended to include her untreated rectal condition on March 17, 2021.

Plaintiff alternatively argues (with respect to both conditions) that her claim should not be dismissed for failure to exhaust administrative remedies because she has been released from prison. In support of that argument, she cites several cases from other districts that have so held. *See, e.g. Morris v. Eversley*, 205 F. Supp. 2d 234, 241 (S.D.N.Y. 2002) (judicial efficiency

weighs against dismissing for failure to exhaust administrative remedies for a released prisoner who could simply refile after the case was dismissed without prejudice); *Ovens v. State of Alaska, Dep't of Corr.*, No. A98-0199-CV (HRH), 2000 WL 34514101, at *3 (D. Alaska Mar. 13, 2000) (dismissal for failure to exhaust not warranted because released prisoner was "now on the same footing as any other former prisoner who would not be required to exhaust his administrative remedies").

Plaintiff's argument that she should be excused from the exhaustion requirement in light of her release is contrary to the plain language of the PLRA and the bulk of applicable caselaw. The PLRA's requirement is clear: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Here, Plaintiff was released from prison on June 5, 2023. Neusteter Decl. Ex. 25 ¶ 1. She filed suit on March 24, 2022, while she was still in custody. ECF 1. Accordingly, the exhaustion requirement of the PLRA claim applies. The bulk of the case law addressing the issue of an exception for prisoners subsequently released agree that no such exception exists. *See, e.g.*, *Becker v. Vargo*, No. CIV.02-7380CO, 2004 WL 1068779, at *3 (D. Or. Feb. 17, 2004) (collecting cases), *report and recommendation adopted,* No. CIV. 02-738-CO, 2004 WL 1071067 (D. Or. Mar. 12, 2004), and *report and recommendation adopted,* No. CIV.02-728-CO, 2004 WL 1179332 (D. Or. May 27, 2004).

Thus, Plaintiff failed to exhaust all available administrative remedies relating to inadequate medical treatment and Defendants are entitled to summary judgment on Plaintiff's Inadequate Medical Care Claim (Fourth Claim for Relief). Because the Court finds that Defendants are entitled to summary judgment on this basis, it does not address Defendants'

alternative arguments relating to evidence of deliberate indifference and the existence of qualified immunity.

For the same reason, Defendants are also entitled to summary judgment against the portion of Plaintiff's Transport Conditions Claim (First Claim for Relief) that relates to inadequate treatment of her alleged head injury (*i.e.*, FAC ¶ 51(q)).[7]

## II.    Negligence Claim

Defendants move for summary judgment against Plaintiff's negligence claim based on the conditions during transport and at DRCI during the evacuation as well COVID-19 conditions generally (Fifth Claim for Relief).[8] Defendants concede that there is a genuine issue of fact as to the portions of this claim related to Plaintiff's head injury, Def. Reply 6, but argue that the rest of Plaintiff's Fifth Claim for Relief is barred by Or. Rev. Stat. § 30.650 for failure to identify evidence of economic damages.

Or. Rev. Stat. § 30.650 provides that: "Noneconomic damages, as defined in ORS 31.710, may not be awarded to an inmate in an action against a public body unless the inmate has established that the inmate suffered economic damages, as defined in ORS 31.710." Economic damages are defined by statute to include: "objectively verifiable monetary losses" such as for medical services, loss of income, or "reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property." Or. Rev. Stat. § 31.705(2)(a).

---

[7] As addressed above, Defendants are entitled to summary judgment on the remainder of this claim based on Plaintiff's failure to present a genuine issue of fact as to any physical injury sufficient to overcome the bar pain and suffering damages under the PLRA.

[8] Although Defendants initially moved for summary judgment against all negligence claims, they have since conceded that Plaintiff has established a genuine issue of material fact as to all negligence claims except this one. Def. Reply 6, ECF No. 75.

Plaintiff presents evidence that she suffered economic damages related to her head injury, as Defendants have conceded. Neusteter Decl. Ex. 25; Def. Reply 6. However, the bulk of the allegations in Plaintiff's Fifth Claim for Relief are unrelated to those conditions and their resulting damages. Plaintiff has presented no evidence of economic damages resulting from the lack of access of prisoners during the evacuation to restrooms, food, water, medications, or sanitary products. Nor has she presented evidence of economic damages relating to COVID-19 conditions or her alleged COVID-19 diagnosis. Accordingly, Plaintiff's Fifth Claim for Relief is partially barred by Or. Rev. Stat. § 30.650 and Defendants are entitled to summary judgment except as it relates to Plaintiff head/neck injury.

**III.    Breach of Contract Claims**

Plaintiff does not oppose Defendants' motion as to the Eighth and Ninth Claims for Relief based on breach of contract. Pl. Resp. 35. Accordingly, Defendants are entitled to summary judgment in their favor on these claims.

///

///

///

///

///

///

///

///

///

///

## CONCLUSION

Defendants' Motion for Summary Judgment [65] is GRANTED in part and DENIED in part. The Court grants summary judgment for Defendants on Plaintiff's First, Second, Fourth, Eighth, and Ninth Claims for Relief. Defendants Causey and Brown are entitled to summary judgment in their favor on Plaintiff's Third Claim for Relief. Defendants are entitled to summary judgment against Plaintiff's Fifth Claim for Relief except as it relates to the alleged head and neck injury. Defendants' motion for summary judgment is otherwise denied.

IT IS SO ORDERED.

DATED:_____January 4, 2024____.

MARCO A. HERNÁNDEZ
United States District Judge